UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

REGIONS BANK,

        Plaintiff,

v.                                             Case No: 6:20-cv-658-Orl-40EJK

RAYMOND JAMES & ASSOCIATES,
INC., MICHAEL MONTALVO and
MAURICIO RICARDO CARDENAS,

        Defendants.
_____/

## ORDER

This matter is before the Court on Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 2 (the "**Motion**")), filed April 16, 2020. Upon due consideration of the Motion, supportive filings, and applicable law, the Court finds that a temporary restraining order is due to be granted. The Court will take Plaintiff's request for a preliminary injunction under advisement and sets forth a briefing schedule herein.

**I.    BACKGROUND**

Plaintiff Regions Bank is an Alabama Chartered Bank that serves customers throughout the southern United States, including Florida. (Doc. 2-1, ¶ 3). Plaintiff is a full-service provider of consumer and commercial banking, wealth management, and mortgage products. (*Id.*). Defendant Raymond James & Associates, Inc. ("**Raymond James**"), is a competing financial services firm incorporated in Florida. (Doc. 1, ¶ 4).

Plaintiff employed Defendant Montalvo ("**Montalvo**") as a private wealth advisor ("**PWA**") and Defendant Cardenas ("**Cardenas**") as an asset management portfolio manager ("**AMPM**") in its Orlando office beginning on April 13, 2015, and August 17, 2015,

respectively. (Doc. 2-1, ¶¶ 7, 10).[1] Throughout their employment with Plaintiff, Montalvo and Cardenas (collectively, the "**Individual Defendants**") serviced customer accounts representing more than $204,991,840 and $178,468,156 in assets under Plaintiff's management, respectively. (*Id.* ¶¶ 9, 12). These accounts generated over $3.5 million in annualized revenue for Plaintiff. (*Id.* ¶ 13). Plaintiff entrusted the Individual Defendants with access to its confidential information to service and manage customer accounts effectively. (*Id.* ¶ 28).

At the start of their employment with Plaintiff, the Individual Defendants executed Employment Agreements ("**Agreements**") containing post-employment restrictions. (Docs. 2-4, 2-5). The Agreements provide that:

> 1. All customer information, including all contact information, financial information, and service records of any kind, whether maintained on paper or stored electronically, and whether in original or copied form, is confidential and proprietary to Regions ("Confidential Information"). Confidential Information includes information concerning any customer I serviced on behalf of Regions or learned of at Regions and any lead or referral provided by Regions. **I will not disclose Confidential Information to any third party, including competitors of Regions, at any time during my employment with Regions**, except for the purposes of conducting business on behalf of Regions, **or at any time after termination of my employment for any reason**. Upon termination of my employment with Regions, I will immediately return all Confidential Information to Regions and will relinquish access to, possession of, and control over any such information in any form.
>
> 2. For a period of one year following the termination of my employment for any reason, **I will not: (a) solicit**, either directly or indirectly, **any Regions customer, account, client, whom I served or whose name became known to me during my employment at Regions** ("Customer") to do

---

[1] PWAs develop significant relationships with Plaintiff's customers, become financial partners to affluent clients, and develop business through these relationships. (*Id.* ¶ 8). AMPMs assist Plaintiff's clients and trust administrators to develop investment objectives and goals, cultivate new trust and investment management accounts while retaining current relationships, and keep abreast of trends and developments in the securities market to ensure prudent investment of customer funds. (*Id.* ¶ 11).

2

>   business with any other person or entity, transfer business services or relationships from Regions to another person or entity, or to otherwise reduce or discontinue the Customer's business patronage, services, or relationships with Regions; **or (b) initiate contact or communication with any Customer for the purpose of soliciting him or her to do business with any other person or entity**, transfer business services or relationships from Regions to another person or entity, or to otherwise reduce or discontinue the Customer's business patronage, services, or relationships with Regions.

(*Id.*) (emphasis added). Additionally, the Individual Defendants consented to the entry of a temporary restraining order ("**TRO**")—and preliminary and permanent injunctions—if they violate the Agreements' terms. (*Id.*). The Agreements provide that:

>   4. In the event that I breach, or Regions reasonably anticipates that I am about to breach, any of the covenants of paragraphs 1, 2, or 3, I agree and recognize that Regions will suffer immediate and irreparable harm that money damages will not be adequate to compensate Region or to protect and preserve the status quo. Therefore, I HEREBY CONSENT TO A TEMPORARY RESTRAINING ORDER WITH OR WITHOUT NOTICE, and A PRELIMINARY and PERMANENT INJUNCTION ordering that:
>
>   >   a. I immediately return to Regions all customer information and records, whether original, copied, duplicated, reproduced, computerized, handwritten, recreated, compiled, or stored in any way whatsoever, and that I be enjoined and restrained from using or disclosing all such information and records;
>   >
>   >   b. For a period of one year, I be enjoined and restrained from soliciting any customer whom I served or whose name became known to me while employed by Regions; and
>   >
>   >   c. For a period of one year, I be enjoined and restrained from recruiting or soliciting any Regions employee to resign from Regions or to join me or my new employer.

(*Id.*).

On April 6, 2020, the Individual Defendants resigned from Plaintiff, abruptly and without notice, and began working for Raymond James. (*Id.* ¶ 14). Shortly thereafter, Plaintiff became concerned that the Individual Defendants had taken confidential customer information and were using that information to solicit customers to transfer their

3

accounts to Raymond James. A trade publication reported that their move from Plaintiff to Raymond James had been "in the works for over a year." (Doc. 2-2, p. 2).[2] This statement was corroborated by an early 2019 incident where Montalvo approached two other PWAs employed by Plaintiff and asked if they were interested in leaving for another firm. (Doc. 1-2, ¶ 15).[3] Additionally, in early 2020, Montalvo sent multiple emails containing customer information to his personal email account in violation of Plaintiff's employee policies. (Doc. 2, p. 10).[4]

Events occurring after the Individual Defendants' resignations further support Plaintiff's suspicions. In the six business days since their resignations, two accounts that the Individual Defendants serviced formally requested account transfers. (Doc. 1-2, ¶ 30). Another 12 customers requested updated "loan pay off" statements, suggesting that they too are preparing to transfer their accounts. (*Id.*). Other customers reported to Plaintiff's management team that the Individual Defendants contacted them and encouraged them to transfer their accounts and business to Raymond James. (*Id.* ¶ 19). Based on conversations with clients and employees, Plaintiff believes that these solicitations began prior to the Individual Defendants' resignations. (*Id.* ¶ 22).

On April 16, 2020, Plaintiff initiated this lawsuit. (Doc. 1). The Complaint alleges claims against Defendants for breach of contract, misappropriation of trade secrets,

---

[2]  District courts may consider hearsay evidence on a motion for a preliminary injunction. *See Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

[3]  Montalvo later denied that this incident occurred. (*Id.*).

[4]  When questioned about these emails, Montalvo claimed that his behavior was in the service of his clients and that he had since deleted the information. (*Id.*).

breach of fiduciary duty, unfair competition, unjust enrichment, tortious interference with business relationships, and civil conspiracy. (*Id.*). Plaintiff now moves for a TRO enjoining Defendants from further misusing Plaintiff's trade secrets and soliciting Plaintiff's customers. (Doc. 2).

## II.   STANDARD OF REVIEW

A district court may issue a TRO without notice to the adverse party if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). TROs are granted in only limited circumstances. "Such orders will be entered only in emergency cases to maintain the status quo until the requisite notice may be given and an opportunity is afforded to opposing parties to respond to the application for a preliminary injunction." Local Rule 4.05(a).

To obtain a TRO, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable injury "so imminent that notice and a hearing on the application for preliminary injunction is impractical if not impossible"; (3) that the balance of the equities favors the movant; and (4) that a TRO would not harm the public interest. Local Rule 4.05(a)(2)–(4). A TRO is an "extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion' as to *each* of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)) (emphasis added). Ultimately, issuing a temporary restraining order or a preliminary injunction should be "the exception rather than the rule." *Siegel*, 234 F.3d at 1176.

## III. DISCUSSION

### A. Plaintiff Has a Substantial Likelihood of Success on the Merits

As a preliminary matter, the Court is persuaded—at this stage of litigation, at least—by the evidence set forth in Plaintiff's Motion and attached affidavit. This evidence clearly suggests that the Individual Defendants have been using Plaintiff's confidential information to solicit former customers and transfer their accounts to Raymond James. This finding indicates a substantial likelihood that Plaintiff will succeed on the merits of several causes of action, as discussed in further detail below.[5]

#### *1.  Misappropriation of Trade Secrets*

Both the federal Defend Trade Secret Act ("**DTSA**") and the Florida Uniform Trade Secrets Act ("**FUTSA**") authorize a court to grant an injunction to prevent "actual" or "threatened" misappropriation of a "trade secret." 18 U.S.C. § 1836(b)(3)(A)(i); Fla. Stat. § 688.003(1); *Primo Broodstock, Inc. v. Am. Mariculture, Inc.*, No. 2:17-CV-9, 2017 WL 1502714, at *10 (M.D. Fla. Apr. 27, 2017). FUTSA and DTSA similarly define a "trade secret" as: (1) any type of information, (2) that derives economic value from being secret, and (3) that is kept secret. *See* 18 U.S.C. § 1839(3); Fla. Stat. § 688.002(4). Both Acts define "misappropriation" as the acquisition of a trade secret of another by a person without consent and by improper means. 18 U.S.C. § 1839(5); Fla. Stat. § 688.002(2). Finally, the Acts define "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through

---

[5] This Order focuses on Plaintiff's likelihood of success in establishing misappropriation of trade secrets (Counts II and III) and breach of contract (Count I). These Counts are sufficient to warrant a TRO, so the Court declines to express an opinion on the remaining causes of action alleged in the Complaint.

6

electronic or other means." 18 U.S.C. § 1839(6); Fla. Stat. § 688.002(1). Simply put, Plaintiff must demonstrate that it possessed a trade secret that was misappropriated using improper means.

Here, Plaintiff presents an affidavit of Alex J. Gonzalez, Senior Vice President and Regional Wealth Executive for Plaintiff. (Doc. 2-1). Mr. Gonzalez enumerates Plaintiff's confidential information, describes the economic value derived from such information's secrecy, and outlines Plaintiff's endeavors to keep such information secret. (*Id.* ¶¶ 24–27). The Court believes that such information—specifically, Plaintiff's customer lists—constitutes trade secrets within the meaning of the FUTSA and DTSA. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555, 1558 (S.D. Fla. 1992) (holding that lists of customers serviced by a financial advisor were a trade secret); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Silcox*, No. 01-8800-CIV, 2001 WL 1200656, at *5 (S.D. Fla. Sept. 14, 2001) ("[A] customer list is a trade secret under Florida law.").

The Individual Defendants agreed to maintain the secrecy of Plaintiff's trade secrets. (Docs. 2-4, 2-5) ("All customer information . . . is confidential and proprietary to Regions . . . . I will not disclose Confidential Information to any third party, including competitors of Regions, at any time during my employment with Regions . . . or at any time after termination of my employment for any reason."). Accordingly, their disclosure of Plaintiff's customer information to Plaintiff's competitor constitutes a "breach of a duty to maintain secrecy"—that is, "improper means" of acquisition under FUTSA and DTSA. *See* 18 U.S.C. § 1839(6); Fla. Stat. § 688.002(1).

Thus, Plaintiff has established that it possessed trade secrets and that the Individual Defendants misappropriated those secrets using improper means.

## 2. *Customer Non-Solicitation*

The Individual Defendants' Agreements expressly prohibit them from soliciting Plaintiff's customers for a period of one year following the termination of their employment and disclosing, using, or retaining Plaintiff's confidential information for their own benefit or the benefit of any third party. (Docs. 2-4, 2-5). Florida Statutes § 542.335 governs the enforceability of customer non-solicitation agreements. A restrictive covenant must be: (1) "reasonable in time, area, and line of business"; (2) supported by "a legitimate business interest"; and (3) "reasonably necessary" to protect that interest. Fla. Stat. § 542.335(1)(a)–(c); *see also Hilb Rogal & Hobbs of Fla., Inc. v. Grimmel*, 48 So. 3d 957, 959 (Fla. 4th DCA 2010) (applying § 542.335 to enforce a customer non-solicitation agreement).

The Agreements were reasonable in time, area, and line of business. First, Florida courts presume that covenants containing time restrictions of five years or less are reasonable. Fla. Stat. § 542.335(e). The period specified in the Agreements was only one year. Second, Florida courts uphold non-solicitation agreements that do not specify a geographic restriction if such agreements are otherwise narrow. *See Envtl. Servs., Inc. v. Carter*, 9 So. 3d 1258, 1264 (Fla. 5th DCA 2009) (collecting cases). The Agreements do not specify a geographic area, but the other provisions are sufficiently narrow to support enforcement. Third, the Agreements prohibit the solicitation of any customer whom the Individual Defendants serviced during their employment with Plaintiff—that is, the exact same line of business.

Under Florida law, legitimate business interests include: trade secrets; valuable confidential business or professional information that does not qualify as trade secrets;

substantial relationships with specific prospective or existing customers; extraordinary or specialized training; or customer goodwill associated with an ongoing business or professional practice. Fla. Stat. § 542.335(1)(b). "Trade secrets, customer lists, and the right to prevent direct solicitation of existing customers are, per se, legitimate business interests subject to protection." *Hagerty*, 808 F. Supp. at 1558. Here, the Agreements were reasonably necessary to protect Plaintiff's confidential information, goodwill, and trade secrets—including customer lists and other confidential customer confidential information.

Thus, the Individual Defendants' Agreements are enforceable under Florida law, and the Individual Defendants' conduct amounts to a knowing violation of their non-solicitation and non-disclosure covenants.

### B. Plaintiff Will Suffer Irreparable Harm in the Absence of an Injunction

Before the Court may issue a preliminary injunction, the plaintiff must show that irreparable harm is not merely possible, but likely. *Alabama v. U.S. Army Corp. of Eng'rs*, 424 F.3d 1117, 1131 (11th Cir. 2005). "An injury is irreparable only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir.1987). "The possibility that adequate compensatory . . . relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Florida law presumes irreparable harm where a defendant violates an enforceable restrictive covenant. Fla. Stat. § 542.335(1)(j); *see also Hagerty*, 808 F. Supp. at 1558–60 ("an injunction, not monetary damages, was the proper remedy for a breach of [an employment contract]"). Likewise, the "use of specific trade secrets, customer lists, or

direct solicitation of existing customers" creates a presumption of irreparable injury and may be specifically enjoined. Fla. Stat. § 542.33(2)(a); *see also Silcox*, 2001 WL 1200656, at *5.

Here, Plaintiff has carried its burden of proving irreparable harm. The Court has already determined that Plaintiff is substantially likely to succeed in proving that the Individual Defendants violated their Agreements (*i.e.*, enforceable restrictive covenants). Moreover, the evidence suggests the Individual Defendants have used specific trade secrets (including customer lists) and engaged in direct solicitation of Plaintiff's existing customers. Furthermore, the Individual Defendants have already conceded that Plaintiff will suffer immediate and irreparable harm if they breach the Agreements. (Docs. 2-4, 2-5). Accordingly, the Court presumes that Plaintiff has suffered and will continue to suffer irreparable harm in the absence of an injunction.

### C. The Balance of Harms Favors Plaintiff

The balance of harms typically favors injunctive relief against employees who resign and enter into direct competition with their former employer. *See, e.g.*, *N. Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1231 (M.D. Fla. 2002).

On the one hand, an injunction would enforce Fla. Stat. § 542.335, protect Plaintiff's investments, goodwill, business reputation, trade secrets, methods of business operation, and contract rights. On the other, the Individual Defendants will not be harmed by an injunction that mirrors their existing contractual obligations. Accordingly, the threatened injury to Plaintiff outweighs any harm to Defendants.

### D. An Injunction Serves the Public Interest

There is a strong public interest in protecting confidential information and enforcing restrictive covenants that promote legitimate business interests. *Medai, Inc. v. Quantros, Inc.*, No. 6:12-cv-840, 2012 WL 3542412, at *7 (M.D. Fla. Aug. 16, 2012) (citing *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004)). The public's interest in safeguarding trade secrets and enforcing contractual obligations is satisfied by the issuance of an injunction.

### E. Bond is Unnecessary

Rule 65(c) of the Federal Rules of Civil Procedure requires the successful applicant to post security "sufficient for payment of costs and damages as may be incurred or suffered by the party determined to have been enjoined wrongfully." *Exch. Int'l, Inc. v. Vacation Ownership Relief, LLC*, No. 6:10-cv-1273, 2010 WL 4983668, at *2 (M.D. Fla. Dec. 2, 2010). The district court has discretion to issue a preliminary injunction without requiring Plaintiff to post security. *Univ. Books & Videos, Inc. v. Metro. Dade Cty.*, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999). "The amount of an injunction bond is [a matter ultimately] within the sound discretion of the district court." *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1127 (11th Cir. 1997). Indeed, "the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005). Based upon the evidence presented in the Plaintiff's written submissions, the Court finds that a bond is not presently required. The Court may revisit this issue before ruling on Plaintiff's request for a preliminary injunction.

## IV. CONCLUSION

In sum, the Court makes the following findings of fact and conclusions of law:

1. There is a substantial probability of Plaintiff's success on the merits.
2. Plaintiff would suffer irreparable injury in the absence of a TRO.
3. The harm to Plaintiff in the absence of an injunction would exceed the harm to Defendants if the TRO is issued.
4. The TRO will not disserve the public interest.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion for a Temporary Restraining Order (Doc. 2) is **GRANTED**.
2. The attached Temporary Restraining Order will be **ISSUED** (Doc. 8).
3. A bond is not necessary under the circumstances of this case.
4. Because Defendants have not been served, this Order shall take effect upon proper service on Defendants.
5. This Order shall expire fourteen (14) days after service unless extended by the Court for good cause or the mutual consent of the parties.
6. Plaintiff is **DIRECTED** to immediately serve on Defendants: (1) copies of the Complaint and its exhibits; (2) a copy of the TRO Motion; (3) a copy of this Order; and (4) a copy of the attached Temporary Restraining Order (Doc. 8). Plaintiff is further **DIRECTED** to file proof of service immediately after effecting proper service.
7. Upon service of the Temporary Restraining Order (Doc. 8), Defendants shall immediately certify in writing that they have fully complied with the terms therein.

8. Five (5) business days after Defendants are served, Defendants may file one consolidated response to the Motion and include any opposing declarations or affidavits. *See* Local Rules 3.01(b), 3.01(f), & 4.06(b)(3).

9. Three (3) business days after Defendants respond, Plaintiff may file a reply to Defendants' response. Plaintiff's reply shall be directed only to Defendants' response; shall not include any new issues, rebuttal affidavits, or other evidence in support; and shall not exceed five (5) pages.

10. The Court will schedule a hearing of this matter after Defendants have been properly served.

**DONE AND ORDERED** in Orlando, Florida on April 20, 2020.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties